

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4456 | **DATE** | 10/30/2001 |
| **CASE TITLE** | Charles Freundt vs. Larry G. Massanari | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion for summary judgment [dkt # 13] is granted, Defendant's cross-motion for summary judgment [dkt # 14] is denied, and the Commissioner's decision denying Plaintiff benefits is reversed and remanded to the Commissioner for further proceedings consistent with this opinion. Enter Memorandum Opinion and Order.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

NOV 0 2 2001
date docketed

date mailed notice

tw
courtroom deputy's initials

DOCKETING
NOV -2 AM 7: 41

Date/time received in
central Clerk's Office

mailing deputy initials

**Document Number**

23

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
NOV 2 2001

| | | |
|---|---|---|
| CHARLES FREUNDT,<br>**Plaintiff,** | ) ) ) | |
| v. | ) ) | **Cause No. 00 C 4456**<br>**Magistrate Judge Geraldine Soat Brown** |
| LARRY G. MASSANARI, Acting<br>Commissioner of Social Security<br>Administration,<br>Defendant. | ) ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Freundt brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits under the Social Security Act, 42 U.S.C. § 423 *et seq.* (the "Act"). Plaintiff has filed a motion for summary judgment to reverse and remand the Commissioner's final decision, and the Commissioner has filed a cross-motion for summary judgment to affirm the Commissioner's denial of benefits. [Dkt ## 13, 14.] The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt ## 8, 9.] For the reasons set forth below, the Court GRANTS Plaintiff's motion, DENIES the Commissioner's cross-motion, and REMANDS this case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed an application for Social Security disability benefits on February 9, 1994, claiming that he became disabled on September 16, 1991, as a result of digestive problems due to

1



alcohol abuse, and a broken leg that would not heal. (R. 47.)[1] Plaintiff also said that the leg's healing had been affected by alcohol abuse. (*Id.*) Plaintiff described his daily activity as significantly limited by leg pain, restricting his ability to stand or perform household chores for anything more than short periods of time, making it difficult for him to drive a car or otherwise get around, especially in bad weather, preventing him from doing outside chores and house repairs, and restricting or preventing him from engaging in his former hobbies of fishing and hunting. (R. 63-66.) The Social Security Administration ("SSA") Bureau of Disability Determination denied Plaintiff's application initially on July 28, 1994 (R. 32), and the denial was affirmed on October 17, 1994 (R. 40). Plaintiff requested an administrative hearing on November 9, 1994. (R. 43.) A hearing was scheduled for October 7, 1996 before an Administrative Law Judge ("ALJ"). (R. 146, 149.) The notice to Plaintiff for the date of this hearing stated that the Social Security Administration's Office of Hearings and Appeals ("OHA") had arranged for a medical expert to attend and testify at the hearing. (R. 148.) The scheduled expert was to be Robert W. Marquis, a psychiatrist. (R. 150, 154.)

Plaintiff failed to appear at this hearing, although apparently Plaintiff's attorney was present. (R. 176.) On October 18, 1996, the ALJ issued a notice to Plaintiff regarding this failure to appear,

---

[1] References ("R.") are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

Plaintiff's initial handwritten disability report stated that September 16, 1992 was the date when his condition started to bother him, and September 16, 1991 was the date when his condition finally made him stop work. (R. 47.) The Social Security Administration's computer-printed form identified the date of disability as September 16, 1991 (R. 28), and that date was repeated in the Administrative Law Judge's opinion. (R. 16.) However, because part of the basis of Plaintiff's claim of disability is the leg injury that he incurred on September 16, 1992, it appears that the date of "1991" was simply a mistake. Plaintiff's Memorandum in this case refers to the onset of disability as September 16, 1992. (Pl.'s Mem. Supp. Mot. Summ. J. at 2.)

2

directing Plaintiff to submit a written explanation for his absence, if he wished to request rescheduling the hearing. (R. 156.) The deadline for this written submission was October 18, 1996, the same date on which the ALJ issued and mailed the notice. (R. 156, 161.) Plaintiff's counsel provided the written explanation to the ALJ by letter dated October 31, 1996, which was received by the SSA on November 4, 1996. (R. 158.) Plaintiff's counsel explained that Plaintiff missed the hearing, which was scheduled to commence at 9:30 a.m. on a Monday, because Plaintiff's father died the Saturday just prior to the hearing. (*Id.*)

On December 10, 1996, the ALJ issued a notice dismissing Plaintiff's claim, finding Plaintiff's response to be untimely and failing to show good cause. (R. 161-62.) Plaintiff appealed this dismissal to the Appeals Council. (R. 163.) On August 14, 1998, the Appeals Council reversed the ALJ's ruling and ordered that an administrative hearing be rescheduled, finding that Plaintiff had given a good cause explanation for his failure to appear at the original hearing. (R. 165-66.) The Appeals Council ordered that the ALJ "may take any further action needed to complete the administrative record." (R. 167.)

On October 8, 1998, the ALJ issued a second notice of hearing, for November 24, 1998. (R. 168.) The ALJ did not request either updated physical or mental examinations prior to the hearing or the presence of a medical expert for the hearing itself. The hearing took place on January 21, 1999, with Plaintiff, who was represented by counsel, as the only witness. (R. 191-226.)

On May 20, 1999, the ALJ issued his decision, denying Plaintiff's application for benefits. (R. 16-24.) The Appeals Council denied Plaintiff's request for review on June 30, 2000. (R. 8-9.) Plaintiff filed the present lawsuit July 24, 2000. [Dkt # 1.]

# BACKGROUND

Plaintiff was born July 12, 1947, in Oak Lawn, Illinois. (R. 199.) He attended school through the eleventh grade, and also reportedly acquired various trade skills such as carpentry and plumbing through informal, on-the-job training with family members. (R. 202.) In his youth Plaintiff suffered burns to his lower left leg that required a number of skin graft operations. (R. 86, 204.) Ever since this incident he experienced occasional "crampy" pains in this portion of his left leg. (R. 115, 117, 121.) However, Plaintiff testified that this condition never impeded his ability to work. (R. 63-66, 214.)

Plaintiff worked as a warehouseman for Zayre Corporation for 21 years, until he was laid off on May 23, 1991, when the company declared bankruptcy. (R. 51-52, 121, 203-04.) Plaintiff's duties at Zayre included operating a forklift, manually lifting materials up to 150 pounds in weight, processing inventory paperwork, and serving as lead man and "off-and-on" as working supervisor over a crew of 63 warehouse workers. (R. 51, 203.)

Plaintiff testified at the hearing that the position at Zayre was Plaintiff's last regular job. (R. 202-03.) Plaintiff has no tax record of further earnings following his lay-off from Zayre in May, 1991. Accordingly, his eligibility for Social Security disability benefits ended December 31, 1996. (R. 46.)

### Plaintiff's Injury

On September 16, 1992 Plaintiff suffered a broken leg in a motorcycle accident. He was hospitalized for six days with a sub-trochanteric fracture of the left femur, which required surgery to implant an intramedullar rod secured with a number of metal screws to stabilize the bone

4

fragments. (R. 81, 86-87, 93.) Medical records from this hospitalization indicate that in addition to the fractured femur, Plaintiff showed signs of arthritis in his knees and ankles, and possible osteoporosis in his ankles. (R. 86-87.) During the hospitalization Plaintiff underwent physical therapy for crutch walking and range of motion, which he reportedly tolerated well. On discharge he was instructed to keep weight off the left leg. No pain medication was prescribed for him on discharge. (R. 87.) His treatment with medication consisted of calcium and Vitamin D supplements. (R. 71.)

### Post-Injury Medical History

A month after Plaintiff's discharge from the hospital, Plaintiff came to the hospital emergency room, still on crutches, reporting he heard a "snap" in his injured leg. He complained of pain and was prescribed Tylenol 3. (R. 74, 77.) Plaintiff's osteopathic physician, William A. Earman Jr., D.O., reported that Plaintiff heard a "click" in the area of the fracture while driving his car and tractor. Dr. Earman examined Plaintiff, reviewed updated x-rays, and reported that Plaintiff was doing "fairly well." The doctor directed Plaintiff to decrease his activity to allow the fracture to continue to heal. (R. 82.)

A month later, in November 1992, Dr. Earman again examined Plaintiff and reviewed updated x-rays. At this time Dr. Earman indicated he found "some" evidence of healing, but no evidence of "callus" formation, the bony tissue that usually forms around fractured bone as it heals. (R. 81.) Plaintiff could flex his left knee 90 degrees. Plaintiff still was using crutches, and Dr. Earman directed Plaintiff to continue limiting the weight placed on his left leg. (*Id.*)

In a scheduled follow-up examination the next month, December 1992, Dr. Earman reported

Plaintiff was doing "very well." (R. 80.) X-rays showed Plaintiff was progressing "quite nicely," although the x-rays revealed only "very slightly increased" callus formation. (R. 75.) Dr. Earman allowed Plaintiff to increase weight-bearing on the left leg, and directed him to report back to Dr. Earman on an as-needed basis. (R. 80.)

Plaintiff returned for follow-up x-rays in February, 1993. These showed the rod and screws were holding the fractured femur "in good position," with no change in apposition and alignment of the bone fragments. The radiologist noted "some increase" in callus formation. (R. 72.)

### *Pain Complaints*

Plaintiff did not return to Dr. Earman until January, 1994. At this time Plaintiff complained of persistent soreness in his left leg. X-rays showed no loosening or failure of the implanted support rod. (R. 71.) However, the radiologist reported "no significant change" from the February 1993 x-rays, and noted that although the fracture line was "less distinct than before," callus formation was "not yet noted" in some parts of the fracture site. (R. 70.) Dr. Earman described significant osteopenia (bone loss) in the fracture area, with indications of very slow healing. He surmised that Plaintiff's pain likely was due to osteoporosis and stress over the fracture area. He noted that Plaintiff continued to walk with a limp. Dr. Earman reported he did not plan to remove the stabilizing rod because of his concern that there should be solid fusion of the fractured bone. (R. 71.) Dr. Earman indicated Plaintiff should continue taking calcium and vitamin D supplements, but apparently did not prescribe any pain medication. (*Id.*)

Because he did not plan to remove the rod, Dr. Earman recommended that a sitting occupation would be helpful to Plaintiff. Dr. Earman added that, as far as whether Plaintiff could

6

return to work, the doctor believed "it is possible but I would not anticipate any additional surgery being necessary." (*Id.*)

### Post-Injury Attempts To Find Employment

Plaintiff testified at the hearing that in the years since the September 1992 accident he looked for work but found "the only place[s] that are willing to pay anything, as soon as they find out about my leg they don't want to hire me. They don't want the liability." (R. 223.) Plaintiff testified that he was turned down by "[p]robably 100" prospective employers for this reason. Plaintiff testified that he looked for jobs driving a forklift as he had done at Zayre, but felt he needed a job where he did not have to get on and off constantly and do loading and unloading in addition to driving. He stated, "My leg bothers me that much all the time," and he did not think he could manage the manual work that might be part of a typical forklift-driving job. (*Id.*)

### History of Alcohol Abuse

In his February 1994 application for disability benefits, Plaintiff stated that alcohol abuse was a factor in his disability. (R. 47.) B. Murthy, M.D., a physician who examined Plaintiff in May 1994 at the direction of the Illinois Disability Determination Services agency, which investigated Plaintiff's disability claim for the SSA, reported Plaintiff as stating he had a history of alcohol dependency since age 18 or 19. (R. 115.) At the time he was hospitalized for the broken leg in September 1992, Plaintiff reported drinking about one six-pack a day (of beer presumably). At this hospitalization he also admitted experiencing "occasional DTs" (presumably episodes of alcohol-related delirium tremens). (R. 86.)

Lambros Chrones, M.D., a psychiatrist who examined Plaintiff in June 1994, also at the

direction of the Illinois state agency, reported Plaintiff had a 25-year history of using alcohol. Plaintiff apparently described his drinking as becoming "a problem" only in the past two years. (R. 120.) Plaintiff explained that during this period he was living with his second wife and her two children from a prior marriage. These children reportedly were involved in "drugs" and "stealing money," abused alcohol, and verbally abused Plaintiff, creating an anxious situation where Plaintiff thought he was going to have a nervous breakdown. (*Id.*) He issued an ultimatum to his wife that her children must move out, and the wife left with the children. After this, Plaintiff's drinking accelerated. (*Id.*)

Plaintiff reportedly reached a point during this period where he drank a case of beer and a fifth of whiskey a day. (R. 115.) In August or September 1993 he was hospitalized with abdominal pain and swelling that reportedly was diagnosed as cirrhosis of the liver. (R. 48, 115.) Plaintiff was given alcoholism counseling during this hospitalization, but apparently did not follow up with further counseling upon discharge from the hospital. (R. 120.) At the time of the medical consultative examinations in mid-1994, Plaintiff reported variously that he still was drinking two beers a day or two or three beers a week. (R. 115, 120-21.)

At the hearing in 1999, Plaintiff testified that he last drank regularly in about 1996 following the death of both his parents and one of his brothers in 1995 and 1996. (R. 212-13.) He stated that he stopped drinking on his own initiative, and never underwent any form of treatment for alcoholism. (R. 212.) He reported that his most recent drink prior to the January 1999 hearing had been a glass of wine on the previous Thanksgiving Day. (*Id.*)

### Treating Physician's Finding

In his application for disability benefits Plaintiff identified "Dr. Prasad" as the doctor who treated Plaintiff when he was hospitalized in August 1993 for "damaged liver." (R. 48.) At the request of the Bureau of Disability Determination Services, on April 20, 1994 Dr. Prasad filled out a form "Liver Report" questionnaire stating that he diagnosed Plaintiff as having alcoholic cirrhosis of the liver, a fractured left femur, anemia, burns to his left leg, and duodenic gastritis. (R. 113.) He dated the onset of Plaintiff's condition as "several years." (*Id.*) Dr. Prasad's report notes various laboratory tests on August 16 and 18, 1993, on which Dr. Prasad based his diagnosis of cirrhosis of the liver. He reported that Plaintiff's symptoms included ascites (abnormal accumulation of fluid causing swelling in the abdomen), which had persisted for more than three months. (*Id.*) He noted also that there was no present evidence of hepatic encephalopathy (brain damage related to liver failure). (*Id.*)

The questionnaire asked for an evaluation of Plaintiff's ability to do various work-related activities. Dr. Prasad responded that Plaintiff was "unable to perform any work." (R. 114.) Of the specific activities listed in the questionnaire, Dr. Prasad noted that lifting, carrying, and handling objects was "difficult" for Plaintiff, but that Plaintiff's ability to hear, speak, and travel was "fair." (*Id.*) Dr. Prasad noted he last examined Plaintiff on December 13, 1993. (R. 113.) Plaintiff confirmed in his application for disability benefits that he last saw Dr. Prasad in December 1993, stating that he sought treatment from Dr. Prasad "as often as I can afford." (R. 48.)

### Examining Medical Consultants' Findings

Dr. Murthy, the consulting physician who examined Plaintiff at the request of the Bureau of

Disability Determination Services in May 1994, a month after Dr. Prasad's report, stated that ascites was not noted. (R. 116.) Dr. Murthy's report did not include any new laboratory tests regarding Plaintiff's liver condition and does not state that Dr. Murthy had access to the August, 1993 laboratory tests performed by Dr. Prasad. (R. 115-18.) Dr. Murthy included in his summary impressions that Plaintiff had a "[h]istory of alcoholic liver disease (?) cirrhosis of the liver with ascites." (R. 117, question mark in original.)

Dr. Murthy also reported that his physical examination showed Plaintiff had "significant limitation of movement" in his left hip, with flexion limited to 70 degrees, internal rotation ten degrees, external rotation ten degrees and painful, and abduction 20 degrees. (R. 116-17.) He noted that Plaintiff "continues to have pain and stiffness in the left hip which gets worse on weight bearing activities." (R. 117.) Dr. Murthy diagnosed the leg fracture as now including evidence of traumatic arthritis to the left hip joint. (Id.) Another examining consultant, Allan Paris, Jr., D.O., reported that a May 11, 1994 x-ray of Plaintiff's left leg showed "advanced deminerilization." (R. 118.)

At his May 1994 examination by Dr. Murthy, Plaintiff reported he was taking four prescription medicines: Spironolactone (a treatment for cirrhosis of the liver), Zantac (prescribed for ulcers), Darvocet (a medication prescribed for pain), and Valium (a muscle relaxant prescribed for such things as problems related to skeletal joint disorders, as well as for general relief of stress, and treatment for delirium tremens in alcohol abuse).[2] (R. 115.) By comparison, in his February 1994 application for disability benefits, Plaintiff stated that he was taking the following: Zantac, Metronidazole (a treatment for skin infection), Sperudnolactone (a treatment for fluid buildup in

---

[2] Information about the medications referenced in this paragraph is from "RxList, the Internet Drug Index" (www.rxlist.com), compiled by Neil Sandow, Pharm. D. and published by HealthCentral.com, Inc.

skeletal joints), and Excedrin PM (pain). (R. 62.) Plaintiff's treating physician, Dr. Prasad, reported that medication treatment of Plaintiff's liver ailment had included: the ulcer treatment Zantac, Kdactene (for liver malfunction), and Zlapyl (sleep sedative). (R. 113.) In his June 1994 examination by Dr. Chrones, Plaintiff reported his medications as: the ulcer treatment Zantac and the liver treatment Spironolactone. (R. 121.)

Dr. Chrones, the consulting psychiatrist who examined Plaintiff, noted Plaintiff's history of hospitalization for "ulcer, kidney problems and liver problems." (R. 120.) Dr. Chrones noted that at the time he examined Plaintiff in June 1994, Plaintiff appeared somewhat depressed, and that Plaintiff complained of depression and stress ever since the motorcycle accident "left him unable to work." (R. 121.) Plaintiff reported appetite disturbance, sleep disturbance, and decreased self esteem. (*Id.*)

Dr. Chrones stated that as to activities of daily living, Plaintiff reported attending to housecleaning, but relied on others for his meals because he could not stand long enough to cook. Plaintiff said he had given up his hobby of fishing, and socialized little outside his family. (*Id.*)

Dr. Chrones diagnosed Plaintiff as having a depressive disorder, and "probable alcohol dependence, in partial remission." (R. 122.) He concluded: "Overall, the combination of the claimant's physical and psychiatric impairments results in significant functional limitation." (R. 123.)

### Non-Examining Medical Consultant's Opinion

The Bureau of Disability Determination Services obtained an assessment of Plaintiff's physical and mental "residual functional capacity" by submitting the records of examining physicians

11

for evaluation by a non-examining medical consultant, Jose L. Gonzalez, M.D. (R. 124-45.) References in the July 15, 1994 evaluations of Dr. Gonzalez indicate he based his conclusions on review of Dr. Murthy's May 1994 report and Dr. Chrones's June 1994 report, and also had available to him Dr. Prasad's April 1994 report. (R. 130-31, 138.)

Dr. Gonzalez acknowledged Plaintiff's history of a broken leg that placed some limitations on Plaintiff. (R. 125-26, 131.) Dr. Gonzalez noted that the x-rays were "said to show" that Plaintiff's leg fracture was not healing well, but Dr. Gonzalez went on to state that Plaintiff "is not being followed by an M.D." (R. 131.) He noted the indications of advanced demineralization reported by Dr. Paris in the May 1994 x-rays taken at the request of the Bureau of Disability Determination. (*Id.*) Dr. Gonzalez also noted Plaintiff could walk one-half block and drive a car, walked with a limp, had decreased range of motion in his left hip, and complained of pain in his left leg and hip. (*Id.*)

Despite these factors, Dr. Gonzalez concluded that physically, Plaintiff retained the residual functional capacity to occasionally lift objects weighing up to 20 pounds, frequently lift objects up to ten pounds, stand and walk for six hours in an eight-hour workday, sit for six hours in an eight hour workday, and perform push/pull functions without limitation using either hand or foot controls. (R. 125.) Dr. Gonzalez concluded that Plaintiff could perform balancing and stooping functions frequently, and occasionally perform climbing, kneeling, crouching, and crawling functions. (R. 126.) Dr. Gonzalez found no other limitations on, for example, Plaintiff's ability to manipulate, his visual ability, or his ability to communicate. Nor did Dr. Gonzalez find any environmental limitations such as the need to avoid extreme cold, heat, humidity, wetness, vibration, or hazards such as machinery or heights. (R. 128-29.)

Dr. Gonzalez acknowledged that Plaintiff's attending physician reported in April 1994 that Plaintiff was unable to do any work. However, Dr. Gonzalez discounted this report as "not documented by the information on file," which Dr. Gonzalez believed indicated Plaintiff could do light work restricted as noted above. (R. 130.)

In his assessment of Plaintiff's mental residual functional capacity, Dr. Gonzalez noted that Plaintiff was "limited by alcohol abuse (but now in partial remission) and chronic reactive depression." (R. 135.) Dr. Gonzalez concluded these limitations would preclude Plaintiff from performing detailed, complex work requiring much concentration and attention. He also concluded that Plaintiff seemed capable mentally of performing simple, routine, repetitive-type work on a sustained basis. (*Id.*) Dr. Gonzalez assessed Plaintiff as having only a slight restriction on activities of daily living and slight difficulties maintaining social functioning, and that Plaintiff seldom would experience deficiencies of concentration, persistence, or pace that would result in failure to complete tasks in a timely manner. (R. 144.) Dr. Gonzalez found the evidence insufficient to determine whether Plaintiff had experienced psychiatric episodes of deterioration or decompensation in work or work-like settings. He considered that any limitations on Plaintiff's activities were due to physical, not mental, problems. (*Id.*)

### *Hearing before the ALJ*

Except for the ALJ's original intention to bring in a medical expert for the first scheduled administrative hearing in October 1996 (R. 148, 150) – which was not carried out when the hearing finally occurred in January 1999 – there is no indication that either Plaintiff or the SSA provided or sought to obtain any medical evidence to update the record between the time of Plaintiff's

consultative examinations in May and June 1994 and the January 1999 hearing, or any time thereafter.

Prior to the January 1999 hearing, counsel for Plaintiff submitted a memorandum to the ALJ summarizing Plaintiff's claim. (R. 184-85.) That memorandum argued that Plaintiff's impairment met or equaled the SSA's regulations for disability due to arthritis of a major weight-bearing joint.[3] (R. 184.) Counsel emphasized: "[T]his claim is not based on alcoholism. Alcoholism is not a material factor in this claim for disability." (*Id.*) Plaintiff's counsel attached a document from Prudential Insurance Company confirming that Prudential had granted Plaintiff a waiver of premium payment on an insurance policy, based on evidence indicating Plaintiff became disabled September 16, 1992. (R. 186.)

The ALJ prefaced the January, 1999 hearing by noting a change in the law, which the ALJ described as follows:

If alcoholism is involved here and that's the main reason for [Plaintiff's] disability

---

[3] Plaintiff's counsel argued Plaintiff's condition met or equaled the listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.03:

1.03 Arthritis of a major weight-bearing joint (due to any cause):

With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:

A. Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand; or

B. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint and return to full weight-bearing status did not occur, or is not expected to occur, within 12 months of onset.

if any, he would not be entitled to any benefits. However, if he could show that the alcoholism did not disable him, but rather he was disabled because of other reasons, other impairments either physical or mental, then he would be entitled to benefits.

(R. 196.) Plaintiff's counsel responded in his opening argument, "The evidence shows that alcoholism is not a material factor here," citing the June 1994 report of Dr. Chrones (Exhibit 15 at the hearing), which counsel said described Plaintiff's alcoholism as being in remission. (R. 197.)

### Plaintiff's Hearing Testimony

In addition to the testimony described *above*, Plaintiff responded to the ALJ's questioning that his main complaint was "[i]t just always hurts" at the places near the knee and the hip bone where the pins were inserted in the rod in Plaintiff's leg. (R. 210.) Plaintiff testified that the leg pain bothered him all the time. (R. 211.) He stated he underwent therapy for eight or ten months after he left the hospital when he broke his leg in 1992. (R. 207-08.) According to Plaintiff, his doctor initially said that the rod in Plaintiff's leg would be removed after one year. However, because the leg "wouldn't heal" the doctor (or more accurately, *a* doctor)[4] subsequently advised "you're going to have to keep it in forever." (R. 210.) Plaintiff testified it took two years after he broke his leg before he could walk without crutches or a cane. (R. 205.)

Plaintiff testified that he did not obtain further treatment for his leg after the rod implant because there was nothing else the doctor could do. (R. 209.) He said his doctor advised at the time that if the leg continued to bother Plaintiff as much as it was, there was some kind of treatment with

---

[4] The colloquy between the ALJ and Plaintiff indicates a confusion of references between Plaintiff's discussions with Dr. Earman, who did the surgical implant and follow-up treatment at the time Plaintiff broke his leg, and Dr. Prasad, who treated Plaintiff's liver condition. (R. 209-10.) Plaintiff testified it was Dr. Prasad who told him the implant would be permanent. (R. 210.) The decision not to remove the implant, however, is reflected in Dr. Earman's medical report. (R. 71.)

"little machines" that could be tried. (*Id.*) Plaintiff testified that he did not obtain this treatment at the time, and later when he tried to go back to this doctor he found the doctor (Dr. Earman) had moved his practice and Plaintiff was unable to relocate him until sometime shortly before the hearing. (R. 210.)

Questioned about his current status, Plaintiff testified that he lived in the home of a brother in downstate Illinois for a year, from September 1997 to September 1998. (R. 200, 208.) He last saw Dr. Prasad sometime in 1997 (R. 208-09), but subsequently when Plaintiff tried to contact Dr. Prasad he learned this doctor had died. (R. 210.) Plaintiff was not questioned about why he went to live with his brother, or how he occupied himself while living there. He commented that his brother's wife took care of all the household chores. (R. 219.) The brother's house was on a lake, and Plaintiff fished "just about every day" the previous summer. (R. 215.)

Since returning to the Chicago area in September 1998 Plaintiff was living with a friend, Jeffrey Hylton, and Hylton's family. (R. 200-01.) He had no source of income (R. 202) and his friend allowed him to stay with the Hyltons rent-free. (R. 201.) Hylton operated a mechanic's repair shop out of his garage, and Plaintiff drove to pick up parts for Hylton once or twice a month. (R. 204.) Hylton paid Plaintiff $10 or $15 a time for these errands, and Plaintiff estimated he received about $100 total for this activity since coming to live with the Hyltons. (*Id.*) Plaintiff listed his daily activities as doing some housework such as dishwashing and sweeping, mopping, and vacuuming floors, sometimes cooking, doing his own laundry, and helping to carry in light groceries such as a gallon of milk. (R. 217-18.) He did not do outside house maintenance such as mowing grass or shoveling snow. (R. 218-19.)

Plaintiff testified he could not do sustained activities because of his leg pain and did not do

many activities at all. (R. 211.) He could walk one and a half blocks, and stand or sit for an hour at a time if he shifted his weight off his left leg. (R. 211-12, 221.) He avoided lifting over ten or twenty pounds because of his doctor's warning that if he ever broke his leg again, he would have to "either get a plastic knee or a plastic hip." (R. 221.) He said he probably could lift and carry ten or twenty pounds, "but it would scare me to do it" because of his leg. (R. 221-22.) He estimated he could lift an object weighing 40 pounds if it was just sitting on a table and he were using only his arms. (R. 222.) He could drive a car if it had an automatic shift, but his own vehicle was a pickup truck with standard transmission, and consequently he did not drive it often. (*Id.*)

The ALJ questioned Plaintiff about hobbies and other activities. Plaintiff stated he used to hunt and fish a lot, but had not hunted since before he broke his leg. (R. 214-15.) He stopped hunting because his injured leg prevented him from doing the walking required. (R. 215.) Plaintiff mentioned previously coaching his son (now 25 years old) in little league baseball. (R. 215-16.) He previously belonged to a gun club where he did target shooting, but sold his guns two years ago because he needed the money. (R. 216.) He did not take trips, had no girlfriend, and otherwise only visited a friend maybe twice a month. (R. 220.) He described his appetite as good, but said his leg bothered him a lot and interfered with his ability to sleep. (R. 217.)

The ALJ did not question Plaintiff about whether Plaintiff was taking any medication for his claimed leg pain. The ALJ did not question Plaintiff about any of the medications referred to in the 1994 medical records. Although Plaintiff brought up the subject of his attempts to find work, the ALJ did not question Plaintiff to establish what limitations, if any, Plaintiff's age might place on Plaintiff's ability to learn a new job or adapt to a new work environment.

## DISABILITY DETERMINATION PROCESS

The Social Security regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (1999). The Commissioner must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either step three or step five. A negative answer at any step (other than step three) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, after which the burden shifts to the Commissioner at step five. *Id.*

When a claimant for disability benefits cannot be found disabled based upon medical considerations alone, the Social Security Administration has established the Medical-Vocational Guidelines ("the Grid") in order to assess a claimant's ability to engage in substantial gainful activity.[5] *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1999). The Commissioner's analysis at step five typically involves an evaluation of the claimant's residual functional capacity to perform a

---

[5] The Grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. The Grid was promulgated to simplify the process, and improve the consistency, of disability determinations. These guidelines, however, are only to be applied when they accurately describe a claimant's abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462 n. 5 (1983). If a claimant's non-exertional limitations restrict the full range of employment opportunities at the level of work that he or she is capable of performing, use of the Grid is precluded. *Id.*

particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Grid to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. 20 C.F.R. Part 404, Subpart P, App. 2.

If use of the Grid is appropriate, the Commissioner may rely upon it for determining disability, and the Grid alone suffices as substantial evidence to uphold the decision of the Commissioner. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). However, the use of the Grid is inappropriate if the claimant suffers from severe non-exertional impairments that prevent the claimant from performing the work indicated by the Grid.[6] *Id.* at 640-41.[7]

The determination as to whether use of the Grid is appropriate is a question of fact, and the Commissioner's decision to use the Grid will be upheld if substantial evidence supports its application. *Id.* at 641. "To uphold the ALJ's finding that the grids may be used in a given case, we require only that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Walker*, 834 F.2d at 641 (quoting *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986)).

---

[6] A non-exertional limitation affects the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, or handle, and use of the fingers for fine activities. Such a limitation does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. An exertional activity is any of the primary strength activities like sitting, standing, walking, lifting, carrying, pushing, or pulling. Social Security Ruling No. 83-10. *See Warmoth v. Bowen*, 798 F.2d 1109, 1110 (7th Cir. 1986).

[7] The fact that a claimant suffers from a non-exertional impairment does not automatically preclude utilization of the Grid. It is only when the non-exertional impairments are severe enough so that use of the Grid is not appropriate that the court will reverse a determination of non-disability based on the Grid. *Walker*, 834 F.2d at 641.

When the Grid cannot be used to assess whether the claimant is capable of doing substantial gainful activity, other reasonable evidence must be relied upon to prove the claimant's employment opportunities are not significantly diminished. *Warmoth*, 789 F.2d at 1112. A vocational expert may be used by the Commissioner to assess whether there are a significant number of jobs in the national economy that the claimant can perform. *Id.*; 20 C.F.R. § 404.1566(e).

## ALJ'S DECISION

The ALJ made his determination that Plaintiff was not disabled by applying the five-step analysis outlined above. 20 C.F.R. § 404.1520. First, the ALJ concluded that Plaintiff's report of occasionally picking up parts for Jeffrey Hylton's repair business, which was the only employment Plaintiff reported having since the claimed onset of his disability, did not constitute substantial gainful employment under the Regulations. (R. 18.)

Accordingly, the ALJ proceeded to the second step of the analysis, to determine whether Plaintiff had a "severe" impairment as defined by the Regulations, *i.e.*, an impairment that significantly limited Plaintiff's physical or mental ability to perform basic work activities. 20 C.F.R. 1520(c). The ALJ summarized Plaintiff's medical history, beginning with the childhood leg burn that continued to cause crampy pain, the September 1992 motorcycle accident, and the history of alcohol abuse. (R. 19.) The ALJ noted the surgery to implant the stabilizing rod in Plaintiff's leg, and the slow healing. Although the ALJ concluded the leg injury had healed within 12 months, he noted Plaintiff's continuing complaints of pain and limitation of motion. (*Id.*) The ALJ noted Plaintiff's testimony that he stopped drinking heavily after his parents and brother died, and had not had a drink since "December 1997." The ALJ concluded that Plaintiff's alcoholism "seems to be

in remission." (*Id.*) The ALJ then determined that Plaintiff had "severe impairments due to status-post burn to the left leg, a left thigh and spinal [*sic*] injury with surgery, arthritis[,] and alcoholism in remission." (*Id.*)

In step three of his analysis, the ALJ considered whether Plaintiff's impairment met the definition of a disabling condition under the listing of impairments in the Regulations. 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) Without categorizing specific impairments, the ALJ concluded that Plaintiff's impairments "both individually and in combination" did not meet or equal a listed impairment under the Regulations. (*Id.*) The ALJ rejected Plaintiff's argument that he met the requirements for Listing 1.03, arthritis of a major weight-bearing joint. The ALJ stated that Plaintiff returned to full-weight-bearing status of his broken leg within one year of his surgery, and although Plaintiff still walked with a limp, he was able to do so without an assistive device. (*Id.*)

The ALJ then proceeded to steps four and five, in which he considered whether evidence showed that Plaintiff retained the residual functional capacity to perform his past work or any other work existing in significant numbers in the national economy. (R. 20.) In step four the ALJ concluded that Plaintiff's residual functional capacity was restricted to the extent that Plaintiff was not able to perform his former work of warehouse supervisor, which the ALJ described as involving walking seven hours per eight-hour workday, and lifting and carrying up to 100 pounds. (R. 22.) However, in step five the ALJ determined that Plaintiff retained the residual functional capacity to perform a full range of sedentary work, which the ALJ defined as involving an ability to lift no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. (R. 20.) The ALJ cited 20 C.F.R. § 404.1567 as the source of this definition for sedentary work. (*Id.*)

The ALJ referred to selected portions of the medical evidence to support his determination. He noted that the childhood leg burn had never prevented Plaintiff from working. (R. 20.) He acknowledged that Plaintiff's broken leg was slow to heal, but again the ALJ concluded Plaintiff "recovered within one year." (*Id.*) He summarized Dr. Earman's December 1992 report as showing that Plaintiff was "progressing nicely" and "doing very well," and noted Dr. Earman's recommendation that Plaintiff continue to increase the amount of weight bearing on the broken leg, and return as needed. (*Id.*) The ALJ described Plaintiff as then canceling appointments in January and February 1993, but noted the radiologist's report of the February 1993 x-ray showing "some increase" in callus formation. (*Id.*) This reference to the February 1993 x-ray report was the only discussion of callus formation pointed out by the ALJ.

The ALJ acknowledged Plaintiff's complaint of persistent soreness at the January 1994 examination by Dr. Earman, and x-ray evidence of significant osteopenia. However, the ALJ noted that there was no evidence of loosening or failure of the implant, that Plaintiff reportedly walked with only a mild limp, and that Dr. Earman "concluded [Plaintiff] could perform a sedentary type of job." (R. 20.) The ALJ made no reference to Dr. Earman's January 1994 report that healing appeared to be very slow, and that consequently Dr. Earman determined not to remove the implanted support rod, which apparently had been his original treatment plan. (R. 71, 210.)

The ALJ next cited Dr. Murthy's consultative examination in May 1994. (R. 20.) The ALJ noted the report that Plaintiff walked with a limp, but added that Plaintiff did not need "any assistive device." (*Id.*) He reported the range of motion figures -- 70 degrees flexion, ten degrees rotation, 20 degrees abduction -- but did not mention that this range of motion actually was less than the 90 degrees flexion Plaintiff was capable of after he left the hospital a year and a half earlier. (R. 21, 81.)

22

The ALJ noted the x-ray evidence of advanced demineralization, but also described the x-rays as showing Plaintiff's leg fracture to be "healed or healing." (R. 21.) The ALJ then commented that purportedly "no aggressive treatment has been recommended" since Plaintiff's 1992 implant surgery, and that Plaintiff "has not sought regular medical attention for his impairments." (*Id.*)

The ALJ chose to discount the opinion of Plaintiff's treating physician, Dr. Prasad, in which Dr. Prasad stated that Plaintiff was unable to do any work. (*Id.*) The ALJ concluded that Dr. Prasad's opinion was not entitled to controlling weight, because, the ALJ said, Dr. Prasad gave this opinion in April 199<u>6</u> but had not even seen Plaintiff since December 1993. (*Id.*) In fact, Dr. Prasad's report that Plaintiff was unable to work was dated April 199<u>4</u>, not April 1996. (R. 114.)

The ALJ also criticized Dr. Prasad's opinion in that, although Dr. Prasad treated Plaintiff for liver damage, purportedly Dr. Prasad concluded Plaintiff could not work without "even know[ing] if [Plaintiff] was still drinking or not." (R. 21.) Oddly, the ALJ criticized Dr. Prasad's notation that Plaintiff's ability to hear and speak was "fair" on the ground that Plaintiff alleged "no limitations whatsoever" in this regard. (*Id.*) However, Dr. Prasad's notation was clearly a response to the SSA form questionnaire asking for comment about the claimant's speaking and hearing ability. (R. 114.)

The ALJ also stated that, although Dr. Prasad reported Plaintiff had difficulty with lifting, carrying, and handling objects, Dr. Prasad "did not note any problems" in Plaintiff's ability to sit, stand, or walk. (R. 21.) However, Dr. Prasad was aware of Plaintiff's broken leg, and the doctor's conclusion that Plaintiff is "unable to perform any work" appears in response to the form's question about the claimant's ability to perform work-related activities, such as sitting, standing, and moving about. (R. 114.) The ALJ concluded that Dr. Prasad's opinion was "not supported by the medical evidence," but the ALJ did not specify what evidence he considered as contradicting Dr. Prasad's

opinion. (R. 21.)

The ALJ also dismissed Plaintiff's subjective complaints, conceding Plaintiff had "some limitations," but concluding these limitations were "not to the extent alleged." (R. 21-22.) The ALJ recited seven factors that the Regulations require to be considered in determining whether to credit a claimant's subjective complaints: 1) Plaintiff's activities of daily living; 2) the location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side-effects of medication taken to alleviate pain or other symptoms; 6) measures other than medication Plaintiff used to alleviate symptoms; and 7) other factors. (R. 21.) 20 C.F.R. § 404. 1529; Social Security Ruling 96-7p. However, the ALJ did not apply this analysis to Plaintiff's subjective complaints. Instead, the ALJ set out a series of facts about Plaintiff's past and current life, apparently recounting matters as they were covered in the hearing testimony. (R. 22.)

The ALJ then analyzed whether there were jobs other than Plaintiff's former work of warehouse manager that existed in significant numbers in the national economy, and which Plaintiff could perform given his medically determinable impairments, functional limitations, age, education, and work experience. (R. 22.) To make this determination, the ALJ utilized the Grid. (R. 23.) 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 201.18 and 201.19.

Without elaborating on the basis for his finding, the ALJ classified Plaintiff as a "younger individual" under the Regulations. (R. 23-24.) 20 C.F.R. § 404.1563. The ALJ considered that Plaintiff had only a limited education as defined under 20 C.F.R. § 404.1564, and had no acquired work skills that would be transferable to skilled or semiskilled activities of other jobs under 20 C.F.R. § 404.1568. (R. 24.) Combining these factors with his finding that Plaintiff was capable of "a full range of sedentary work," the ALJ concluded that the Grid directed a finding of "not

24

disabled." 20 C.F.R. § 404.1569 and Appendix 2 of Subpart P, Table 1, §§ 201.18 and 201.19. (*Id.*) Accordingly, the ALJ ruled that Plaintiff was not under a disability as defined by the Act at any time through his last insured date of December 31, 1996. (*Id.*) 20 C.F.R. § 404.1520(f); Social Security Act §§ 216(i) and 223.

## PLAINTIFF'S OBJECTIONS TO ALJ'S DECISION

Plaintiff's request for review to the SSA's Appeals Council (R. 188-90) argued that substantial evidence did not support the ALJ's finding that Plaintiff can do a full range of sedentary work, nor his finding that Plaintiff's "testimony as to pain and restricted motion is not credible." (R. 188.) Plaintiff contended further that the ALJ erred as a matter of law by: 1) applying the Grid despite the record evidence of Plaintiff's pain, and that the ALJ erred by failing to obtain testimony from a vocational expert instead of relying on the Grid; 2) by rejecting Plaintiff's claim of pain; 3) by applying the age categories of the Regulations in a mechanical manner to classify Plaintiff as a "younger individual," where Plaintiff's age should have been analyzed as a borderline situation for the next higher age category; 4) by failing to give appropriate weight to the evidence of Plaintiff's treating physician, Dr. Prasad, who found Plaintiff unable to perform any work; 5) by substituting his own judgment for that of the treating physician; and 6) by failing to consider the entire record in making his decision of not disabled. (188-90.)

The Appeals Council denied Plaintiff's request for review without commenting specifically on any of Plaintiff's arguments. (R. 8-9.) Plaintiff now has reiterated some of these arguments in his present motion for summary judgment. Plaintiff contends in this lawsuit: first, that substantial evidence does not support the ALJ's determination that Plaintiff can perform a full range of

sedentary work (Pl.'s Mem. at 6; Reply Mem. at 1 [Dkt ##13, 18]); second, that the ALJ improperly applied the age categories of the Regulations in a mechanical way in determining Plaintiff is a "younger individual" (Pl.'s Mem. at 8; Reply Mem. at 3); third, that the ALJ also erred by applying the Grid rather than obtaining testimony from a vocational expert (Pl.'s Mem. at 8; Reply Mem. at 5.); and fourth, that the ALJ erred in rejecting the evidence of Plaintiff's treating physician, Dr. Prasad. (Pl.'s Reply Mem. at 3.)

## COMMISSIONER'S RESPONSE TO PLAINTIFF'S OBJECTIONS

The Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff is capable of performing not only sedentary work, and, indeed, substantial evidence would have supported a conclusion that Plaintiff is capable of performing the broader category of "light work." (Def.'s Mem. at 8, 12-13.) The Commissioner defends the ALJ's decision not to give controlling weight to Dr. Prasad, Plaintiff's treating physician, arguing that medical evidence did not support Dr. Prasad's opinion as to Plaintiff's impairment related to his fractured leg, and that Dr. Prasad's opinion that Plaintiff had cirrhosis of the liver was not supported. (Def.'s Mem. at 9.) The Commissioner argues that the ALJ correctly found Plaintiff's complaints (*e.g.*, of "debilitating pain") "not wholly credible," in light of Plaintiff's testimony about his daily activities, his failure to seek further medical attention, his testimony at the hearing and Dr. Earman's "conservative," "non-aggressive" treatment. (Def.'s Mem. at 11-12.) In addition the Commissioner notes that Plaintiff "lost his job over a year before his accident," suggesting that this was a "motivational factor" for Plaintiff's claim. (Def.'s Mem. at 12.) The Commissioner contends that the ALJ did not abuse his discretion in applying the "younger individual" category to Plaintiff where there was no showing

why Plaintiff should be categorized differently and Plaintiff was seven months short of the next age group. (Def.'s Mem. at 13-14.)

The Commissioner also defends the ALJ's application of the Grid rather than obtaining testimony from a vocational expert by pointing to the report of the non-examining consulting physician, Dr. Gonzalez. (Def.'s at Mem. 14-15.) The Commissioner argues that the ALJ's rejection of Dr. Prasad's opinion and of Plaintiff's subjective complaints justifies concluding there was no non-exertional impairment that would prevent using the Grid. (Def.'s Mem. at 15.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210 (N.D. Ill. 1996)(Bucklo, J.). Thus, this court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178,

180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## THE COMMISSIONER'S ROLE

When evaluating a disability claim the Commissioner (*i.e.,* the ALJ) must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr*, 912 F.2d 178, 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The district court is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate

his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. March 3, 1994)(Marovich, J.)(ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988).)

## ANALYSIS

### *1. Failure To Give Controlling Weight to Treating Physician's Opinion.*

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The ALJ recited this rule in deciding not to give controlling weight to the opinion of Dr. Prasad, Plaintiff's treating physician, who reported that Plaintiff was "unable to perform any work." (R. 21, 114.) However, the ALJ did not, in fact, follow the rule.

To start, the ALJ made a fundamental mistake of fact in evaluating Dr. Prasad's opinion. The ALJ discounted Dr. Prasad's opinion on the belief that Dr. Prasad rendered the opinion in April 1996 without having examined Plaintiff since December 1993. (R. 21.) In fact, as the Commissioner now concedes, the record demonstrates that Dr. Prasad rendered his opinion in April 1994, not April 1996. The Commissioner now notes, "The ALJ stated that this report was dated April 1996, and the

date is difficult to decipher, but it appears that the report was in 1994 since Dr. Gonzalez reviewed the report later that year [in July 1994] (Tr. 130)." (Def.'s Mem. at 5, n. 3.) Dr. Prasad's opinion was given less than four months after the last treatment Plaintiff obtained from him. (R. 113.)

Because a fundamental reason for the ALJ's decision to discount the treating physician's opinion was based on a plain error of fact that was patent on the record, that decision is not supportable. The case must be remanded on that basis at least, so that the ALJ can, on remand, consider the treating physician's opinion appropriately.

There are other problems with the ALJ's analysis of Dr. Prasad's opinion. The ALJ also criticizes the value of Dr. Prasad's opinion on the grounds that Dr. Prasad "did not even know if the claimant was still drinking or not." (R. 21.) The ALJ does not indicate how he reached this conclusion from reviewing Dr. Prasad's report; perhaps the ALJ inferred it from his mistaken belief that Dr. Prasad had not seen Plaintiff for almost three years. (*Id.*.) When Dr. Prasad's report is viewed in its true time frame, less than four months after Plaintiff's last treatment, the opposite inference can be drawn.

As noted above, the ALJ criticized Dr. Prasad's report for not commenting on Plaintiff's ability to sit, stand and walk. The questionnaire asks for a narrative answer about Plaintiff's ability to perform nine different work-related functions. Because Dr. Prasad's report records Plaintiff's leg fracture as part of Plaintiff's current diagnosis, as well as anemia, duodenic gastritis, and leg burn, presumably Dr. Prasad's opinion about Plaintiff's inability to work takes into consideration all of these medical factors in addition to the liver cirrhosis condition.

Finally, the ALJ's opinion fails to specify the "medical evidence" that he states is contrary to Dr. Prasad's opinion. The ALJ's rejection of Dr. Prasad's opinion was contrary to the SSA's

Regulations: "We will always give good reasons. . . for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2), quoted in *Clifford*, 227 F.3d at 870.

### 2. Plaintiff's Credibility Regarding His Subjective Complaints

The ALJ concluded there was some support for Plaintiff's subjective complaints, "but not to the extent alleged." (R. 22.) The ALJ then recited Plaintiff's testimony about his daily activities, and listed various features of Plaintiff's medical history. However, apart from naming these items of information, the ALJ made no explanation how this evidence called into question the severity of Plaintiff's subjective complaints.

The ALJ's determinations regarding Plaintiff's credibility generally will not be overturned unless they are patently wrong. *Zurawski v. Heckler,* 245 F.3d 881, 887 (7th Cir. 2001). Where the ALJ discounts Plaintiff's subjective complaints in denying disability, it is the ALJ's responsibility to build an accurate and logical bridge from the facts to the conclusion the ALJ draws from those facts. *Id.*

The ALJ correctly cited SSR 96-7p as providing the format for analyzing the credibility of Plaintiff's subjective complaints.[8]  (R. 21.)  However, SSR 96-7p requires the ALJ to provide "specific reasons for the finding on credibility, supported by the evidence in the case record."

---

[8]  Social Security Ruling 96-7p instructs the ALJ to consider the following factors in evaluating Plaintiff's subjective complaints of pain or other symptoms:  1) Plaintiff's activities of daily living; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate or aggravate the symptoms; 4) what medications Plaintiff takes to alleviate pain or other symptoms, in what dosage, and with what effectiveness and side effects; 5) what treatment, other than medication, Plaintiff undergoes or has undergone to alleviate pain or other symptoms; 6) measures other than treatment Plaintiff uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms.

*Zurawski*, 245 F.3d at 887, *quoting* SSR 96-7p. The ALJ's explanation for discounting the Plaintiff's subjective complaints must be "sufficiently specific to make clear to [Plaintiff] and to any subsequent reviewers the weight the adjudicator gave to [Plaintiff's] statements and the reasons for that weight." *Id.* In this regard it is not sufficient for the ALJ to make a single, conclusory statement that "the [Plaintiff's] allegations have been considered." It also is not enough for the ALJ simply to recite the factors that are described in the regulations for evaluating symptoms. *Id.*

The ALJ's decision fails to meet the requirements of SSR 96-7p. The ALJ lists the factors to be considered under SSR 96-7p, but does not build a bridge of facts from these factors to his conclusion discounting the severity of Plaintiff's pain. (R. 21-22.) Consequently, the Court cannot evaluate whether the ALJ's disregard of Plaintiff's subjective complaints is appropriate. The case must therefore be remanded for the ALJ to show specifically what evidence he has considered regarding each factor of his credibility evaluation under SSR 96-7p.

The ALJ apparently considered that Plaintiff's failure to seek further medical treatment for his leg pain after he saw Dr. Earman in January 1994 was a basis for discounting Plaintiff's subjective pain complaints. (R. 22.) Plaintiff testified his doctor advised some type of electrical device might reduce the pain. Plaintiff never went back to try this treatment. (*Id.*) However, the Commissioner has made no showing that such a treatment would have enabled Plaintiff to return to work. Accordingly, the ALJ may not discount Plaintiff's credibility for failure to seek further treatment, unless the Commissioner can prove treatment would have allowed Plaintiff to work. *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000)(no evidence claimant could return to work if she quit smoking as doctor advised, hence ALJ improperly discounted claimant's credibility on the basis of claimant's failure to follow doctor's advice.).

*Zurawski* emphasizes that the ALJ must "investigate *all* avenues presented that relate to pain." 245 F.3d at 887 (emphasis added). The ALJ did not question Plaintiff about what medication Plaintiff was taking for pain in the period between Plaintiff's last medical examinations in mid-1994 and the December 31, 1996 termination of Plaintiff's insured status, or what self-improvised measures Plaintiff took to counter his reported pain symptoms. *Compare Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). Plaintiff also testified that damp weather aggravated his pain symptoms. (R. 225.) However, the ALJ did not pursue this testimony or seek to determine what other conditions would aggravate Plaintiff's pain. On remand the ALJ should fill out these gaps in the evidence before deciding whether to discount Plaintiff's subjective complaints.

### 3. *Borderline Age*

The Plaintiff's age category for purposes of applying the Grid is significant here. If the ALJ made all the same determinations under the Grid – that Plaintiff had only a limited education, no transferable work skills, and the residual functional capacity to perform only sedentary work (R. 24) – but evaluated Plaintiff in the 50 to 54 age group rather than the 45 to 49 age group that the ALJ in fact utilized, the Grid would dictate a finding that Plaintiff *was* disabled on the last date he was eligible for disability benefits, December 31, 1996. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.09. On December 31, 1996, Plaintiff was six months and 12 days short of his 50th birthday. (R. 28.)[9] The ALJ made no reference to this fact but simply concluded that "the [Plaintiff] is a younger individual." (R. 23-24.)

---

[9] Because Plaintiff's insured coverage period ended prior to the ALJ's hearing and determination, the critical date for assigning Plaintiff's age category under the Grid is the date Plaintiff's insured status ended. *Daniels v. Apfel*, 154 F.3d 1129, 1132 n.4 (10th Cir. 1998).

The Regulations recognize that as age advances, a person is increasingly limited in his ability to adjust to other work. 20 C.F.R. § 404.1563(a). Although technically the "younger person" age category covers anyone age 18 to 49, the Regulations acknowledge that "[i]n some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 404.1563(c). A person age 50 to 54 is classified in the category of "closely approaching advanced age." 20 C.F.R. § 404.1563(d).

The Regulations provide that the ALJ may not apply the age category mechanically in a "borderline" situation:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 CFR §404.1563(b). If there is a shift in the result of applying the Grid between disabled and not disabled that is caused by the passage of "a few days or months" separating the claimant from the next-highest age group, the ALJ must evaluate the age factor as a "borderline situation" rather than assigning the age category based strictly on calendar age. SSR 82-46(c); *Graham v. Massanari,* No. 00 C 4669, 2001 WL 527326, *8 (N.D. Ill. May 9, 2001)(Levin, M.J.); *Hawkins v. Apfel,* No. 97 C 6760, 1998 WL 378421, *1 (N.D. Ill. July 1, 1998)(Levin, M.J.).

Whether Plaintiff's situation– six months and 12 days until his 50th birthday– qualifies as a borderline situation is not expressly decided by the Regulations. The Tenth Circuit has observed, "[T]he Commissioner has expressly refused to further define what a borderline situation is. . . ." *Daniels v. Apfel,* 154 F.3d 1129, 1133 (10th Cir. 1998). The Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) includes two SSA Appeals Council

Interpretations addressing the subject.[10] The first of these, HALLEX II-5-302, issued March 16, 1979, stated that, generally, applying a grid category up to six months prior to attainment of the specified age would be reasonable. At least one court has interpreted this as expressing the Appeals Council's belief that " there is a six month window in which a claimant's situation is 'borderline.'" *Russell v. Commr. Soc. Sec.*, 20 F. Supp. 2d 1133, 1135 (W.D. Mich. 1998). The second interpretation backs off from referring to a specific period of time. HALLEX II-5-302(A), issued November 2, 1993, directs the ALJ to "[d]etermine whether the claimant's age is within a few days or a few months of a higher age category." If so, and if using the higher age category would result in a decision of "disabled" rather than "not disabled," then a borderline situation exists and the ALJ must determine whether it is more appropriate to use the higher age or the claimant's chronological age. *Id.*

A borderline situation has been held to exist where the gap is in the range of three months or less. *See, e.g., Daniels v. Apfel*, 154 F.3d 1129, 1133 (10th Cir. 1998) and *Barrett v. Apfel*, 40 F. Supp. 2d 31, 39 (D.Mass. 1999)(collecting cases). A recent decision in this District concluded that the Commissioner should have made a borderline assessment where the claimant was four and a half months shy of his 50th birthday. *Graham*, 2001 WL 527326, *8. Another decision in this District determined that a borderline assessment should have been made where the claimant was ten months shy of age 55 at the time of the ALJ's decision, but six months past his 55th birthday by the time the Appeals Council issued its denial of a request for review. *Tousignant v. Apfel*, No. 97 C 4150, 1998 WL 142415, *5 (N.D. Ill. March 26, 1998) (Bobrick, M.J.). *Tousignant* is

---

[10] Courts have considered HALLEX as indicating how the Commissioner instructs its adjudicators to interpret the matter. *See, e.g., Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).

distinguishable because, unlike the present case, the claimant's disability insurance coverage period had not yet terminated at the time of either the ALJ's or the Appeals Council's rulings. However, that decision suggests that even a ten-month gap may require consideration by the ALJ as to which category should be applied.

The court in *Roush v. Heckler*, 623 F. Supp. 710 (S.D. Ohio 1985), dealt with a situation similar to the present case. The claimant in *Roush* was 54 years and six months old when his insured status expired on December 31, 1980. *Id.* at 711. As here, the decision not to place him in the higher age category was outcome determinative of his case. *Id.* The court concluded that *Roush* was a borderline case where the ALJ should not have applied the Grid mechanically. *Id.* at 712. The court found particularly significant the facts that the claimant had worked for 20 years at one job, which he was no longer physically capable of performing, and, that, at the time his insured status expired, had been unemployed for over seven years. "These factors have an obvious impact on his ability to adapt to a new work situation and to perform work in competition with others." *Id.*

Those same factors apply in this case. Plaintiff is physically unable to perform the work that he did for 21 years. Also, at the time that Plaintiff's insured status expired on December 31, 1996, he had been unemployed for more than five years. The fact that Plaintiff is six months *and 12 days* short of the next age category cannot justify the ALJ's failure even to consider the issue.

The Commissioner argues that the ALJ did not abuse his discretion in applying Rule 201.18, the Grid category for younger individual aged 45 to 46 years. (Def.'s Mem. at 13.) However, there is nothing in the ALJ's opinion to suggest that he applied any discretion, or that he considered the "borderline" issue at all.

In *Daniels v. Apfel,* the Tenth Circuit rejected the Commissioner's argument that the burden

36

initially is on the claimant to show that his adaptability limitations or related factors require that he be advanced to the next age category in applying the Grid. 154 F.3d at 1133-34. The Tenth Circuit noted that the age category analysis called for by 20 C.F.R. § 404.1563(a) comes in the fifth step of the sequential evaluation process, which is the step where the burden of proof shifts to the Commissioner. *Id.* at 1134. Further, it is the Commissioner's burden to show that a claimant's characteristics (of age, education, transferable skills, and residual functional capacity) "precisely match those of the grids" before the Commissioner can rely on the Grid as sufficient evidence that jobs exist in the national economy that the claimant could perform. *Id.* It is the Commissioner's burden in the first instance to discuss the borderline age issue whenever the claimant is within a few days or months of the next age category and the advance to the next category would change the outcome of applying the Grid. *Id.* at 1136. The Commissioner must determine "on whatever evidence is available" the age category that best describes the claimant. *Id.*

In the present case, Plaintiff contends that the Commissioner erred by not obtaining testimony of a vocational expert on this matter. (Pl.'s Mem. at 8.) However, *Daniels* does not require the Commissioner to obtain expert evidence when there is a borderline age situation, but does require the Commissioner to show that the borderline age issue was considered based on whatever evidence is available. 154 F.3d at 1134. In *Graham, supra*, the court remanded even though the ALJ had obtained testimony from a vocational expert before making the Grid analysis. 2001 WL 527326, *8. The Commissioner argued that the ALJ's consideration of a vocational expert's testimony proved that the ALJ had not applied the age category mechanically. *Id.* The court rejected that argument because it saw no indication that the ALJ ever considered whether the case presented a borderline age situation. *Id.* The court found no legal authority for the proposition that combining use of the

Grid with obtaining testimony from a vocational expert automatically proves the ALJ did not apply the Grid mechanically regarding the age category. *Id.*

On remand, the Commissioner shall analyze the borderline age issue and explain in the ruling what evidence was considered in making the age category decision.

### 4. *Other issues on remand*

On remand the ALJ is also directed to consider the following issues.

A. Plaintiff's non-exertional limitations.

The ALJ must expressly consider whether the evidence of Plaintiff's non-exertional limitations precludes a finding that Plaintiff is capable of performing a full range of sedentary work, and whether that evidence precludes the use of the Grid. The ALJ acknowledged that Plaintiff has "some limitations" consistent with Plaintiff's subjective reports of pain, but the ALJ failed to discuss why he consider those limitations consistent with a full range of sedentary work and the use of the Grid. Likewise, the ALJ failed to discuss the conclusion of the examining psychiatrist, Dr. Chrones that "the combination of claimant's physical and psychiatric impairments results in significant functional limitation." (R. 123.) The non-examining consultant physician, Dr. Gonzalez, concluded after reviewing the medical records that Plaintiff had exertional and postural limitations because he was limited by pain in his right thigh and hip. (R. 126-27.) The ALJ must discuss why the ALJ's conclusion that Plaintiff is capable of performing a full range of sedentary work and the ALJ's use of the Grid are consistent with all of the foregoing evidence. *See Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir. 1987); *Warmoth v. Bowen,* 798 F.2d 1109, 1111-12 (7th Cir. 1986).

### B. The use of a vocational expert.

Contrary to Plaintiff's argument that testimony from a vocational expert is mandatory (Pl.'s Mem. at 8; Pl.'s Reply Mem. at 5), the Regulations allow the ALJ discretion whether a vocational expert's opinion is needed to meet the Commissioner's step five burden of proof (*i.e.*, that there were a significant number of jobs in the national economy up through December 1996 that Plaintiff could perform, considering his residual functional capacity and other factors.) 20 C.F.R. § 404.1566(e); *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).

Although the ALJ may have discretion whether to utilize a vocational expert, the Commissioner may not be able to meet his burden of proof without such evidence if the application of the Grid is precluded because of Plaintiff's non-exertional limitations. In such cases, resolution of the step five issue generally will require consultation of occupational reference materials or the services of a vocational expert. *Id.*; 20 C.F.R. § 404.1566(d).

Where non-exertional limitations exist, they may or may not restrict a person's ability to perform the full range of sedentary work. SSR 85-15(2); SSR 83-13; SSR 83-14. As noted in SSR 85-15(2): "Varying degrees of limitations would have different effects, and the assistance of a [vocational expert] may be needed to determine the effects of the limitations."

On remand, the ALJ is directed to consider whether the testimony of a vocational expert is necessary.

### C. The ALJ's conclusion that Plaintiff's leg healed in one year.

The ALJ stated several times in his eight-page opinion that Plaintiff's broken leg healed within a year. *See* R. 19-20, 22. In making this factual conclusion, the ALJ apparently selected evidence and interpreted it only where it supported his conclusion, while making no comment on

evidence that would seem to contradict his finding. As discussed *above*, when evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333.

The ALJ commented that "notes from [Plaintiff's] doctor show that [Plaintiff's] progress was slow, but he healed within one year." (R. 19, citing R. Ex. 12.) The exhibit referenced by the ALJ, Exhibit 12, comprises all the medical records relating to plaintiff's fractured femur from the date of the injury on September 16, 1992 through the date of Dr. Earman's last recorded examination of Plaintiff, January 14, 1994, and the January 17, 1994 x-ray report. (R. 70-112.)

In January 1994, more than a year after Plaintiff's injury, Dr. Earman reported that Plaintiff was experiencing "persistent soreness," which Dr. Earman attributed to "the osteoporosis and stress over the area of the previous fracture." Dr. Earman commented that the fracture "does show some interval healing although the healing does appear to be very slow at this time." (R. 71.) The radiologist, Dr. Podlusky, reviewed a January 17, 1994 x-ray and noted the fracture, though "less distinct than before," is "still identified." (R. 70.) He indicated that "callus formation [the tissue formation indicative of bone healing] is not yet noted," and described the fracture as "healing" (*i.e.,* in the process of healing, but not yet healed). (*Id.*) A May 11, 1994 report by the SSA-appointed consultant radiologist, Dr. Paris, described the fracture as "healed or healing," but made no comment about the status of callus formation, and instead noted, "Advanced demineralization is demonstrated." (R. 118.)

Dr. Murthy, the consulting physician who examined Plaintiff on May 18, 1994, also reported that Plaintiff still experienced pain and stiffness in his left leg with any increase in weight-bearing activity. (R. 115, 117.) Plaintiff walked with a limp, using no assistive device but showing

40

"significant limitation of movement." (R. 117.) Dr. Murthy reported flexion of the hip joint limited to 70 degrees (R. 116), compared with the 90 degrees of flexion Dr. Earman reported 18 months earlier, in November 1992 (R. 81). These various reports do not support the ALJ's contention that Plaintiff's leg fracture healed within 12 months of the September 1992 accident. The ALJ also noted that Plaintiff had not sought "regular medical attention" for his leg injury since his January 1994 visit to Dr. Earman. (R. 21.) Here, Plaintiff testified his treating physician told him no further treatment was available to improve his fractured leg. (R. 209.)

The ALJ cited the May 1994 report of Dr. Murthy and the June 1994 report of Dr. Chrones, both of which described Plaintiff as walking with a limp, but without an assistive device. (R. 19-20.) Apparently the ALJ considered the ability to walk without assistance to be evidence the injured leg had healed. The ALJ is not qualified or authorized to rely on his lay opinion as to such medical matters. *Davis v. Chater*, 952 F. Supp. at 566.

Accordingly, the ALJ's conclusion that Plaintiff's leg injury healed within a year is not supported by substantial evidence in the record.

D. Consideration of additional expert medical testimony.

By the time the hearing finally occurred in January 1999, the last-dated evidence of examining physicians was more than four and a half years old. As of the December 31, 1996 termination of Plaintiff's insurance coverage, that evidence was more than 18 months old. When the Appeals Council remanded the case for hearing after the ALJ initially dismissed the claim for Plaintiff's failure to appear, the Appeals Council directed the ALJ to take whatever steps he felt necessary to complete the record. (R. 166-67.) The ALJ did nothing to augment or update the record. Instead, the ALJ elected to dispense with the services of a medical expert, which the ALJ

had scheduled for the original hearing, but chose not to reschedule for the January 1999 hearing. (R. 148, 170.) Hence rather than supplementing the record, the ALJ effectively diminished it.

Although the burden of proof generally is on the claimant, it is the ALJ's duty to develop a full and fair record. *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000). In *Smith* the ALJ discounted a treating physician's more recent opinion by relying on x-rays that were ten years old. The court held that failure to develop the record is good cause for remand, and the court failed to see how the ALJ could evaluate the claimant's arthritis condition without more current x-rays. *Id.*

Similarly in the present case, along with the other directives for remand noted above, on remand the Commissioner also must consider whether additional evidence is necessary to obtain to provide a complete record. Such evidence need not cover any more recent time than the period up to December 31, 1996, the date Plaintiff's insurance coverage ended. *Maltry v. Sec. of Health and Human Services,* No. 87 C 20512, 1988 WL 131537, *3 (N.D. Ill. Nov. 29, 1988) (Roszkowski, J.). Nevertheless, the Commissioner must make certain that any relevant gap in medical evidence prior to December 1996 is closed, if possible.

## 5. On remand, the case is to be reassigned to another ALJ.

The ALJ's handling of this case is troubling. For example, in his December 1996 order dismissing the case, the ALJ cited  regulations permitting the ALJ to dismiss "when neither the claimant nor his representative appears at the time and place set for the hearing." (R. 161.) Plaintiff's representative, attorney John Horn, stated that he was present at the time set for the hearing (R. 176), although Plaintiff was not present because Plaintiff's father had died the Saturday before the Monday morning hearing date. (R. 158.) The ALJ's order appears tacitly to acknowledge

that Mr. Horn was present because the ALJ states that "claimant failed to appear" but makes no such statement about the representative. Thus, the order of dismissal is not supported by the regulation that the order cites. Furthermore, the ALJ's decision to dismiss does not explain why Plaintiff's father's death two days earlier was not "good cause" and or why the ALJ concluded that the appropriate result was to dismiss Plaintiff's claim without a hearing. The Appeals Council ultimately reversed that decision, but not until two years later. (R. 165).

In addition, the ALJ's Notice to Show Cause For Failure to Appear, which was prepared and mailed on October 18, 1996 (R. 156, 161), required Plaintiff to "send the [responsive] statement to the address shown above by October 18, 1996," the same date. (R. 156.)

Even more troubling is the ALJ's cursory treatment of a very important – indeed, potentially controlling – piece of evidence, the opinion of Plaintiff's treating physician Dr. Prasad. As discussed *above,* the ALJ discounted that opinion in substantial part based on the ALJ's mistaken belief that it was prepared in 1996. Any careful review of Dr. Prasad's opinion in the context of the record quickly leads to the conclusion that the date is 1994, as the Commissioner now concedes.

The Court can only conclude that, in his analysis of Plaintiff's claim, the ALJ Sprague failed to apply the carefulness and consideration that is the SSA's responsibility. Thus, on remand, the Commissioner is ordered to assign Plaintiff's claim to an ALJ other than the ALJ who rendered the decision in this case.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, Defendant's cross-motion for summary judgment is denied, and the Commissioner's decision denying Plaintiff

benefits is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:   October 30, 2001**